UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| INTERNATIONAL SAFETY ACCESS CORPORATION, </br></br> Plaintiff, </br></br> v. </br></br> INTEGRITY WORLDWIDE, INC., and JOHN MELIC, </br></br> Defendants. | Civil Action No.: 0:09-CV-00315-MJP </br></br> **DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION: (A) TO PIERCE THE CORPORATE VEIL; AND (B) FOR DETERMINATION THAT ASSETS OF PLAINTIFF ARE NOT SUBJECT TO A SECURITY INTEREST** |

AND NOW COME Defendants-Counterclaimants Integrity Worldwide, Inc. and Jonathan J. Melic (collectively "Integrity"), by and through their undersigned attorneys, and file this Memorandum in Support of Motion: (A) to Pierce the Corporate Veil; and (B) for Determination That Assets of Plaintiff Are Not Subject to a Security Interest:

## INTRODUCTION

### A. Underlying Facts

Plaintiff International Safety Access Corporation ("ISAC") commenced this action in an effort to avoid its contractual obligations to Integrity. The trial evidence established that Defendant John Melic invented and developed an edge protection system designed to prevent injuries and deaths from falls at construction worksites. This edge protection system consisted of posts and fences. The posts were designed with lifting and locking mechanisms, to enable quick installation without tools. An early post design utilized an internal "gravity" or "pendulum" lock. Subsequently, Mr. Melic improved the posts by introducing the "speed post" and, later, the "speed velocity post," which utilized handles to lift and lock the posts into position. Each type of post utilized the same claw-like terminals and spring-loaded "gauge" mechanisms to ensure proper and safe installation. Whatever lifting and locking mechanism might be used on the post (gravity/pendulum, speed or speed velocity), the remaining components would remain the same

and the overall system would function in the same fashion. The only difference would be the mechanism used to lift and lock the posts in place.

In early 2006, Integrity and ISAC began negotiating an agreement whereby ISAC would become the United States distributor of ISAC's edge protection system, which Tata Incorporated ("Tata") would supply. The parties entered into a final written Distributor Agreement, which was admitted into evidence as Joint Trial Exhibit 1. Under the Distributor Agreement, ISAC was granted the exclusive right to sell Integrity's edge protection system in the United States. (See Joint Tr. Ex. 1 ¶ 1). Along with this right, ISAC agreed not to sell products outside of its Territory. (See id. ¶ 3). The Distributor Agreement was valid until December 31, 2012 and renewable for additional five-year terms.

The Distributor Agreement required ISAC to purchase minimum quantities annually of products, with a total purchase obligation of $57,000,000.00 over the life of the agreement; this "minimum volumes obligation may be satisfied in aggregate." (See id. ¶ 20). It is undisputed that ISAC never satisfied its minimum purchase obligations. Under the Distributor Agreement, ISAC would purchase products from Tata, and Integrity would receive compensation through a "profit-sharing" arrangement with Tata. (See id. ¶ 6).

In November, 2008, Roger Schwartz sent Mr. Melic an email purportedly terminating the Distributor Agreement, although ISAC had no contractual basis to do so. (See Joint Tr. Ex. 44). In this email, ISAC blamed the economy as its justification for termination; ISAC did not mention any other reasons for termination of the Distributor Agreement. Importantly, ISAC did not accuse Integrity of fraudulent inducement or breaching its contractual obligations. However, a month later in December, 2008, ISAC's trial counsel wrote a lengthy letter asserting for the first time numerous additional (baseless) excuses for ISAC's wrongful termination of the Distributor Agreement. (See Joint Tr. Ex. 45).

**B.**     **Procedural History**

In January, 2009, although IWW had not actively attempted or threatened to enforce the minimum purchase obligations of the Distributor Agreement against it, ISAC commenced this

lawsuit alleging that it was fraudulently induced to enter into the Distributor Agreement and seeking a determination that the Distributor Agreement was unenforceable.  ISAC alleged that Defendants misrepresented that they held enforceable patents relating to the Integrity edge protection system.  ISAC's original complaint did not deny the existence of a signed and enforceable Distributor Agreement; rather, it posited that, presuming the existence of the Distributor Agreement, Defendants' alleged misrepresentations rendered it invalid.  After months of not denying that it had executed the Distributor Agreement, ISAC amended its Complaint — over Integrity's objections — to assert a new declaratory judgment theory.  Specifically, ISAC alleged that the Distributor Agreement, under which the parties operated for over two years, was unenforceable under the statute of frauds.

This case went to a week-long jury trial beginning on June 1, 2011.  At trial, ISAC continued to assert (both as a declaratory judgment claim and as a defense to Integrity's counterclaims) that it had been fraudulently induced to enter into the Distributor Agreement.  Integrity asserted a counterclaim sounding in breach of contract, claiming that ISAC had failed to meet its minimum purchase obligations and wrongfully terminated the Distributor Agreement.  In addition to fraudulent inducement, ISAC argued a number of additional defenses to Integrity's counterclaims, including impossibility, prevention of performance, frustration of purpose, and waiver.  The jury rejected ISAC's defenses, and returned a verdict in favor of Integrity on its counterclaims — finding that ISAC had breached the Distributor Agreement — in the amount of $287,000.00.  (See Docket Entry # 168).  The jury also specifically found that Defendants did not fraudulently induce ISAC into the Distributor Agreement.  The Clerk entered judgment on the jury's verdict on June 10, 2011 ("Judgment").  (See Docket Entry # 174).

**C.     Facts Regarding ISAC's Finances That Are Relevant to the Instant Motion**

ISAC is a South Carolina close corporation, whose present shareholders are Roger Schwartz (25,000 shares) and Ulf Boshamer (212,500 shares).  (*See* Ex. A).  ISAC's Form 1120S for its 2011 federal income tax return shows that it had $108,989 of gross receipts, plus rental

revenue of $47,824, for the year 2011.  (*See* Ex. B).  The same form demonstrates that ISAC had gross receipts of $773,839 and rental revenue of $456,839 for the year 2010.  (*See id.*).

After entry of the Judgment and the eventual disposition of ISAC's post-trial motions, Integrity began to analyze its potential routes for enforcement of and execution upon the Judgment against ISAC.  To further this end, Integrity served discovery requests (including interrogatories and document requests) upon ISAC relating to the potential assets available to satisfy the Judgment.

In response to these discovery requests, ISAC identified certain items of property that it owned:

> 3.     Please identify and itemize — including quantities, descriptions and an estimate of present value — any and all assets owned by ISAC, including real property, personal property, equipment, inventory, intangible property or other assets of ISAC.
>
> **ANSWER:**   ISAC owns no real property.  The personal property, equipment and inventory owned by ISAC are itemized on the balance sheet dated December 31, 2011(Exhibit 1).  ISAC owns no intangible property.  There was a time in the past when ISAC thought it had exclusive rights to sell patented items in the United States.  However, ISAC now makes no such claim.  To the extent representatives of Plaintiff wish to inspect and inventory the edge protection equipment owned by ISAC, arrangements will be made for such inspection and inventory at a mutually convenient time.  The equipment is currently located at 218 North Ransom Street, Gastonia, North Carolina.

(*See* Ex. C).

However, ISAC claimed that these assets could not be used to satisfy the Judgment, because they were subject to a security interest.  Specifically, ISAC claimed that Klear Knit, Inc. ("Klear Knit") — whose majority shareholder was and is Ulf Boshamer, ISAC's chief shareholder — had lent money to ISAC in a series of Demand Promissory Notes, in the following amounts:

4

| DATE[1] | AMOUNT[2] |
|---|---|
| *8/17/2006* | *$76,938.84 (paid in full 11/15/2010 CK #3425)* |
| *8/21/2006* | *$72,053.78 (paid in full 2/18/2011 CK #315(final digit illegible))* |
| *10/6/2006* | *$76,923.78* |
| *10/10/2006* | *$79,967.04* |
| *11/2/2006* | *$105,087.67* |
| *11/7/2006* | *$127,840.68* |
| 11/7/2006 | $538,811.79 |
| 12/22/2006 | $80,000.00 |
| 1/31/2007 | $200,000.00 |
| 1/31/2007 | $80,000.00 |
| 2/23/2007 | $100,000.00 |
| 2/27/2007 | $250,000.00 |
| 3/24/2009 | $30,000.00 |
| 10/21/2009 | $40,000.00 |
| 11/24/2009 | $66,000.00 |
| 1/21/2010 | $40,000.00 |
| 3/2/2010 | $10,000.00 |
| 5/13/2010 | $60,000.00 |
| 7/15/2010 | $15,000.00 |

---

[1] ISAC did not produce separate notes for the entries in *italics*. These entries are referenced in handwritten notes on the November 7, 2006 Demand Promissory Note attached hereto.

[2] Including only the entries supported by actual Demand Promissory Notes produced by ISAC, the total amount lent was $1,509,811.79.

5

(*See* Ex. D).  According to ISAC's December 31, 2011 Balance Sheet, the current balance due on these notes is $1,541,875.81.  (*See* Ex. E).  ISAC clarified the status of these loans in its Answers to Defendants' First Set Interrogatories in Aid of Execution:

> Beginning November l, 2006, ISAC borrowed money from Klear Knit, Inc.  Each loan was memorialized by the execution of a Demand Promissory Note.  With the exception of a payment on August 17, 2006 in the amount of $76,938.24[**3**], these notes remain outstanding and unpaid.  These notes have accrued interest at the rate of 7.5% per annum.  Klear Knit, Inc. is a secured creditor of ISAC and is **owed considerably more than the current value of all ISAC assets**.  ISAC therefore claims all of its assets are exempt from execution to satisfy the Judgment because they are encumbered by the debt owed by ISAC to Klear Knit, Inc.

(*See* Ex. C ¶ 12 (emphasis added)).

However, ISAC has not produced any authenticated security agreement granting Klear Knit a security interest in ISAC's property.  A UCC-1 form listing Klear Knit, Inc. as a secured party and covering "[f]urniture, fixtures, equipment, inventory, accounts, [and] stocks" of ISAC as the security was filed on January 24, 2016.[**4**]  (*See* Ex. F).  However, to date, ISAC had not produced a security agreement relating to same.  Ulf Boshamer is the controlling primary shareholder of Klear Knit, Inc.  (*See* Ex. G).  Upon information and belief, Klear Knit is in the textile business and is not in the business of providing financing to other companies for the purchase of inventory.  Klear Knit is not a bank or financial institution.

For the reasons set forth herein, this Court should: (a) enter an order piercing the corporate veil of ISAC to permit Integrity to execute upon the assets of Ulf Boshamer and Roger Schwartz; (b) judicially determine that the assets of ISAC are not subject to a security interest for the benefit of Klear Knit; and (c) grant such other relief as the Court deems appropriate.

---

**3**    This is inconsistent with ISAC's handwritten notes on the November 5, 2007 Demand Promissory Note.  Those handwritten notations actually suggest that **two** payments were made on the notes in **2010 and 2011**, not 2007.

**4**    The financing statement lists a lapse date of January 24, 2016.  "[A] filed financing statement is effective for a period of five years after the date of filing."  *See* S.C. Code § 36-9-515(a).

## ARGUMENTS

**A.    The Court Should Pierce the Corporate Veil of ISAC to Hold Its Shareholders Directly Liable for the Judgment Against ISAC**

"[I]t is recognized that a corporation is an entity, separate and distinct from its officers and stockholders, and that its debts are not the individual indebtedness of its stockholders." *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 683 (4th Cir. 1976). However, the South Carolina Supreme Court has held that the corporate entity may be disregarded in certain situations. *See Baker v. Equitable Leasing Corp.*, 275 S.C. 359, 271 S.E.2d 596 (1980). "The corporate form may be disregarded only where equity requires the action to assist a third party." *Woodside v. Woodside*, 290 S.C. 366, 370, 350 S.E.2d 407, 410 (Ct. App. 1986).

"'An action to pierce the corporate veil in order to enforce a court's previous judgment is within the purview of Rule 69, Fed. R. Civ. P., and may be commenced as a petition for a writ of execution.'" *Semmaterials, L.P. v. Alliance Asphalt, Inc.*, 2008 WL 161797, at *3 (D. Idaho Jan. 15, 2008) (attached hereto as Ex. H) (*quoting Cordius Trust v. Kummerfeld*, 2004 WL 616125, at *3-8 (S.D.N.Y. 2004), *rev'd on other grounds*, 153 Fed. Appx. 761 (2d Cir. 2005)); *accord Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 125 F.R.D. 144, 146 (N.D. Ill. 1989) (holding that Rule 69 is a proper procedural device for piercing judgment debtor's corporate veil).

"[A] two-pronged test should be used to determine whether the corporate entity should be disregarded. The first part of the test, an eight-factor analysis, looks to observance of the corporate formalities by the dominant shareholders. The second part requires that there be an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the individuals." *See Sturkie v. Sifly*, 280 S.C. 453, 457-58, 313 S.E.2d 316, 318 (Ct. App. 1984). For the reasons that follow, the evidence presently of record establishes that these two factors strongly favor piercing the corporate veil in this case. In the alternative, the Court should permit reasonable additional discovery — including depositions of ISAC's

corporate representative and its shareholders — as to whether the Court should pierce the corporate veil of ISAC.

### 1. The First Prong of the *Sturkie* Analysis (Observance of Corporate Formalities)

The first *Sturkie* prong consists of eight factors, that set forth in *Dumas v. InfoSafe Corp.*, 320 S.C. 188, 463 S.E.2d 641 (Ct. App. 1995):

(1)   whether the corporation was grossly undercapitalized;

(2)   failure to observe corporate formalities;

(3)   non-payment of dividends;

(4)   insolvency of the debtor corporation at the time;

(5)   siphoning of funds of the corporation by the dominant stockholder;

(6)   non-functioning of other officers or other directors;

(7)   absence of corporate records; and

(8)   the fact that the corporation was merely a facade for the operations of the dominant stockholder.

*Dumas*, 320 S.C. at 192, 463 S.E.2d at 644.  "The conclusion to disregard the corporate entity must involve a number of the eight factors, but need not involve them all."  *Id*. (*citing Cumberland Wood Prods. v. Bennett*, 308 S.C. 268, 417 S.E.2d 617 (Ct. App. 1992)).

ISAC is a statutory close corporation.  With regard to such a corporation, certain[5] of the foregoing factors are less applicable:

> The failure of a statutory close corporation to observe the usual corporate formalities or requirements relating to the exercise of its corporate powers or management of its business and affairs is not a ground for imposing personal liability on the shareholders for liabilities of the corporation.

---

[5]   Specifically, the South Carolina Court of Appeals has held that, in the context of a close corporation, the following factors have little or no applicability:  (2) failure to observe corporate formalities; (3) non-payment of dividends; (6) non-functioning of other officers or other directors; AND (7) absence of corporate records.

8

*See* S.C Code § 33-18-250. "This section does not prevent a court from 'piercing the corporate veil' of a statutory close corporation if the circumstances should justify imposing personal liability on the shareholders were the corporation not a statutory close corporation. It merely prevents a court from 'piercing the corporate veil' *because* it is a statutory close corporation." *See id.* Offic. Cmt. The South Carolina Reporter's comments to this section clarify that "[a]lthough this section may be criticized as being self-serving, it is desirable because it reminds courts and lawyers that a closely held corporation should be respected as a separate entity even though it may have the managerial structure of a partnership." *See id.* S.C. Rep. Cmt. As a result, with regard to a close corporation, the truly relevant factors are: (1) whether the corporation was grossly undercapitalized; (4) insolvency of the debtor corporation at the time; (5) the siphoning of ISAC's funds by its dominant stockholder(s); and (8) whether ISAC was merely a facade for the operations of its dominant stockholder. As to the factors that are relevant, it is clear that this Court should pierce the corporate veil of ISAC and enter judgment against its shareholders, Ulf Boshamer and Roger Schwartz, so that they may be held personally liable for the Judgment.

## **Gross Undercapitalization**

Likely the most important factor in this analysis is whether ISAC is grossly undercapitalized. The Court of Appeals recently discussed this factor and its position in the analysis of whether to pierce the corporate veil:

> One fact which all the authorities consider significant in the inquiry, and particularly so in the case of the one-man or closely-held corporation, is whether the corporation was grossly undercapitalized for the purposes of the corporate undertaking. [*See DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 685 (4th Cir.1976).] The Fourth Circuit Court of Appeals continued: (t)he obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter * * * during the corporations operations. *Id.* (*quoting* Gillespie, *The Thin Corporate Line: Loss of Limited Liability Protection*, 45 N.D. L. Rev. 363, 377-8 (1969)). An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability. *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S. Ct. 531, 88 L. Ed. 793 (1944).

9

*See Hunting v. Elders*, 359 S.C. 217, 227, 597 S.E.2d 803, 808 (Ct. App. 2004).

The financial records that ISAC produced following the Judgment demonstrate that, in fact, it is woefully undercapitalized. According to ISAC's balance sheet, as of December 31, 2011, it had current assets of $974,224.75, comprised of inventory of edge protection (totaling $771,759.05), a checking account ($29,919.56), accounts receivable ($8,761.23), prepaid insurance ($4,329.06) and prepaid royalties ($159,455.83). (*See Ex.* E). The balance sheet also reflected "fixed assets" valued at $116,653.43. (*See id.*). The total amount of balance sheet assets was $1,090,878.18. (*See id.*).

That same balance sheet reflects total liabilities of $1,749,376.16. (*See id.*). This total includes $207,500.55 of "current liabilities," comprised of accounts payable ($176,287.27), accrued expenses ($28,209.00), interest payable ($304.55), and sales tax payable ($2,699.73). (*See id.*). ISAC's reported liabilities also include $1,541,875.61 in what it characterizes as "Long Term Notes Payable." (*See id.*). Klear Knit, a company controlled by Ulf Boshamer (the controlling shareholder of ISAC), made the loans memorialized in these notes to ISAC. In reality, those notes payable are not "long-term"; rather, they are demand[6] notes that can be accelerated at any time and become immediately payable in full. According to ISAC, aside from a single payment, ISAC has never made a payment on those notes to Klear Knit. Essentially, Klear Knit — the company controlled by Ulf Boshamer, who also controls ISAC — has been used to indirectly capitalize ISAC and has been granted the right to demand payment, at any time, of over $1.5 million from ISAC.

According to ISAC's own documents, it has only slightly more than $1 million in assets (closer to $800,000 that are tangible assets capable of liquidation to satisfy debts). ISAC's only cash account has a balance of less than $30,000. Against these assets, ISAC's debts are nearly $1.8 million, more than $1.5 million of which are owed to Klear Knit and can be called at any

---

[6] The Demand Promissory Notes' only provision regarding the timing of repayment states that: "[t]he entire principal and any accrued interest shall be fully and immediately payable UPON DEMAND of any holder thereof." (*See* Ex. ___).

time. ISAC claims that all of its assets — far outweighed by its liabilities — are exempt from execution by any creditor other than Klear Knit, which is controlled by ISAC's main shareholder Ulf Boshamer. In other words, there are few, if any, assets that can be executed upon by a creditor other than Klear Knit (Ulf Boshamer's company).

Moreover, ISAC's 2011 income tax return shows total **gross** sales and rental receipts of approximately only $200,000, and a **net loss** of over $330,000. (*See* Ex. B). From this, it is facially apparent that ISAC is not just undercapitalized, but woefully undercapitalized. Its liabilities far exceed its assets. Its assets are all allegedly subject to a security interest inuring the benefit of a company controlled by ISAC's own primary shareholder to secure a series of demand notes. It defies logic to suggest that ISAC is properly capitalized.

According to the documents produced by ISAC, it was not properly capitalized initially, either. Specifically, the only cash capital invested in ISAC in 2006 consisted of deposits totaling $37,500.00. (*See* Ex. E). Subsequently, in 2009 — well after the start of this litigation — Mr. Boshamer deposited another $200,000 of capital into ISAC. (*See id.*). As set forth above, these capital investments have been greatly overshadowed by demand debts payable to Mr. Boshamer's other company, Klear Knit. ISAC has never had sufficient assets to pay off its debts to Klear Knit, and continues to exist at the whim of Klear Knit.

## Insolvency of ISAC

As set forth above, ISAC's current and demand liabilities far exceed its assets, particularly its assets that can be liquidated to satisfy those liabilities. ISAC essentially is permitted to exist at the whim of Klear Knit. If the Demand Promissory Notes (which have never been paid in any material way) are ever called, they will financially ruin ISAC, as it lacks the assets to pay those obligations. Simply put, ISAC is not in a solvent position.

## Siphoning of Funds of ISAC by Dominant Stockholder

Here, it is apparent that ISAC's controlling shareholder, Ulf Boshamer, is attempting to "siphon" its assets for the benefit of his other company, Klear Knit. As discussed above, Klear Knit has made large loans to ISAC that are payable on demand of Klear Knit. In 2011, well after

11

the commencement of this litigation (and only months before trial), Klear Knit (Mr. Boshamer's other company) attempted — without a security agreement — to manufacture a security interest in the property of ISAC. This putative security interest was intended for the benefit of Mr. Boshamer, at the expense of Integrity, a potential (and foreseeable) judgment creditor. Mr. Boshamer has attempted to protect the assets of ISAC and ensure that, in the worst case scenario, he could obtain those assets for his other company.

### ISAC as a Façade for Dominant Shareholders

This case presents an unusual situation where Mr. Boshamer is using one company to, for all intents and purposes, fund another company. He has allegedly loaned $1.5 million through Klear Knit to ISAC. These debts are allegedly evidenced by demand notes secured by interests in ISAC's property. ISAC is basically operating with capitalization primarily coming from Klear Knit. ISAC is, in a very real sense, acting as a façade for Mr. Boshamer's other business.

---

Therefore, for the foregoing reasons, the record is clear that the first prong of the *Sturkie* analysis is easily satisfied by the evidence currently in the record. In the alternative, there is sufficient evidence that this Court should permit a brief period of discovery as to whether the Court should pierce the corporate veil of ISAC in this case.

### 2.   The Second Prong of the *Sturkie* Analysis (Injustice or Fundamental Unfairness)

The second aspect of the analysis mandated by *Sturkie* focuses on the justness or fairness of permitting the shareholders to hide behind the corporate form:

> The second prong of the *Sturkie* test, requiring "that there be an element of injustice or fundamental unfairness if the acts of the corporation be not regarded as the acts of the individuals," *Sturkie*, 280 S.C. at 457-458, 313 S.E.2d at 318, is perhaps more elusive. In *Sturkie*, the court stated:
>
>> The burden of proving fundamental unfairness requires that the plaintiff establish (1) that the defendant was aware of the plaintiff's claim against the corporation, and (2) thereafter, the defendant acted in a self-serving manner with regard to the property of the corporation and in disregard of the plaintiff's claim in the property.

> *Id*. at 459, 313 S.E.2d at 319.  Later cases clarified the actual knowledge requirement by stating that a person is "aware" of a claim against the corporation if he has notice of facts which, if pursued with due diligence, would lead to knowledge of the claim.  *Multimedia Publ'g of South Carolina, Inc. v. Mullins*, 314 S.C. 551, 554, 431 S.E.2d 569, 572 (1993).  Most recently this court has held that "the essence of the fairness test is simply that an individual businessman cannot be allowed to hide from the normal consequences of carefree entrepreneuring by doing so through a corporate shell."  *Dumas*, 320 S.C. at 193, 463 S.E.2d at 644.

*See Hunting v. Elders*, 359 S.C. 217, 228-29, 597 S.E.2d 803, 809 (Ct. App. 2004).

Here, there is no doubt but that the shareholders of ISAC were aware of Integrity's claims — at the absolute latest — when Integrity asserted counterclaims in this lawsuit in 2009.  The shareholders of ISAC cannot seriously contest such knowledge.  On January 24, 2011, shortly before trial in this matter, ISAC filed — or permitted Klear Knit, a company controlled by shareholder Ulf Boshamer to file — a UCC-1 financing statement in an effort to create a fraudulent security interest in ISAC's property.  Essentially, after having knowledge that it could be held liable to Integrity in this lawsuit, ISAC and its shareholders attempted to burden its assets in an effort to prevent Integrity from being able to collect upon the Judgment.  As a result, according to ISAC, there are no assets available to satisfy the Judgment.  Instead, all of ISAC's assets are allegedly tied up securing an obligation **to a company controlled by ISAC's controlling shareholder**.  Basically, ISAC manufactured (or, at least, attempted to manufacture) a way to insulate its assets from Integrity and to keep all of those assets "within the family."  One can scarcely conceive of facts more fundamentally unfair and unjust to a Judgment creditor.

Therefore, for the foregoing reasons, the record is clear that the second prong of the *Sturkie* analysis is also easily established in this case.  In the alternative, there is sufficient evidence that this Court should permit a brief period of discovery as to whether the Court should pierce the corporate veil of ISAC in this case.

Because both prongs of the *Sturkie* test have been met, this Court should pierce the corporate veil of ISAC and enter judgment against Ulf Boshamer and Roger Schwartz, the shareholders of ISAC.

13

**B.     The Court Should Determine That, Contrary to ISAC's Claim, Its Assets Are Not Subject to a Security Interest**

In its Answers to Defendants' First Set Interrogatories in Aid of Execution, ISAC claims that "all of its assets are exempt from execution to satisfy the Judgment because they are encumbered by the debt owed by ISAC to Klear Knit, Inc." (*See* Ex. C ¶ 12). For the reasons that follow, ISAC is incorrect in this contention. Integrity should be permitted to execute upon the inventory and assets of ISAC, without regard for any claimed security interests.

Under Article 9 of the South Carolina Commercial Code, the following requirements must be met for there to be a valid security interest:

> [A] security interest is enforceable against the debtor and third parties with respect to the collateral only if:
>
> (1) value has been given;
>
> (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and
>
> (3) one of the following conditions is met:
>
>> (A) the debtor has authenticated a security agreement that provides a description of the collateral . . .

*See* S.C. Code § 36-9-203(b). A security agreement is "an agreement that creates or provides for a security interest." *See* S.C. Code § 36-9-102(73). The South Carolina Commercial Code defines "authenticate" to mean:

> (A) to sign; or
>
> (B) to execute or otherwise adopt a symbol, or encrypt or similarly process a record in whole or in part, with the present intent of the authenticating person to identify the person and adopt or accept a record.

*See* S.C. Code § 36-9-102(7).

It is apparent — from the South Carolina Commercial Code's use of "authenticate" — that a security agreement must be in writing. *See Mid-Eastern Elec., Inc. .v First Nat'l Bank of S. Md.*, 380 F.2d 355, 356 (4th Cir. 1967) ("A security interest, additionally, is unenforceable unless, under the Code's statute of frauds, the 'debtor has signed a security agreement which

14

contains a description of the collateral.'") (applying Maryland law).  As the South Carolina Supreme Court has stated: "'[t]he court must find **both** language **in a written agreement** that objectively indicates the parties' intent to create a security interest and the presence of a subjective intent by the parties to create a security interest.'"  *See Brockbank v. Best Cap. Corp.*, 341 S.C. 372, 380, 534 S.E.2d 688, 692 (2000) (*quoting In re CFLC, Inc.*, 166 F.3d 1012, 1016 (9th Cir. 1999)) (emphasis added).

      Although Integrity has requested any and all documents that might create a security interest in ISAC's property, the only documents that ISAC has produced are the Demand Promissory Notes.  These notes are simple documents that merely impose repayment obligations on ISAC.  Importantly, the Demand Promissory Notes do not expressly create any security interest in ISAC's property.  The Demand Promissory Notes do not burden ISAC's assets.  They do not specifically identify any property of ISAC that will secure the obligations memorialized therein.

      Rather, the **only** document even purporting to create a security interest in ISAC's property for the benefit of Klear Knit was the financing statement itself.  However, a UCC-1 financing statement, standing alone, is not sufficient to constitute a "security agreement."  *See In re Weir-Penn, Inc.*, 344 B.R. 791, 793 (Bankr. N.D.W. Va. 2006) ("A considerable number of cases have held that a financing statement alone—the purpose of which is only to provide notice that a creditor may, or may not, have a security interest in the listed property—cannot double as a security agreement."); *In re Outboard Marine Corp.*, 300 B.R. 308, 322 (Bankr. N.D. Ill. 2003) ("[T]he majority of UCC jurisdictions holds to the general rule that a standard form financing statement, standing alone, cannot be considered a security agreement and, therefore, does not create a security interest in the debtor's property."); *Yoppolo v. Trombley ( In re DeVincent)*, 238 B.R. 722, 727 (Bankr. N.D. Ohio 1999) (citation omitted) ("[U]nder Ohio law a financing statement, in and of itself, does not exhibit the requisite intent to create a security interest"); *Gibson County Farm Bureau Coop. Ass'n v. Greer*, 643 N.E.2d 313, 320 (Ind. 1994) ("[W]e are not willing to go so far as to hold that a standard-form UCC-1 financing statement alone is, as a

matter of law, sufficient evidence that the parties intended to create a security interest . . . .”). The UCC-1 financing statement did not itself create any security interest in ISAC's property. In any event, the UCC-1 financing statement is not authenticated by ISAC. As a result, it is wholly insufficient to show any intention to create a security interest for the benefit of Klear Knit.

Therefore, ISAC's assertion that its inventory is subject to a security interest for the benefit of Klear Knit is entirely without merit, as there is no security agreement sufficient to create such an interest. As a result, contrary to ISAC's assertions, its assets **are** subject to execution for collection of the judgment, free of any claimed security interest. Therefore, Integrity respectfully requests that this Court judicially determine that ISAC's assets are not subject to a security interest securing debts owed to Klear Knit and are subject to execution in accordance with federal and local law.

## CONCLUSION

For the reasons set forth above, this Court should grant the relief requested herein. Specifically, the Court should pierce the corporate veil and enter judgment against ISAC's shareholders, Ulf Boshamer and Roger Schwartz. In addition, the Court should determine that the assets of ISAC are not subject to a security interest.

BARNWELL WHALEY PATTERSON & HELMS, LLC

BY: /s John W. Fletcher
Randell C. Stoney, Jr.
John William Fletcher
885 Island Park Drive (29492)
P. O. Drawer H
Charleston, SC  29402-0197
(843) 577-7700
Attorneys for Defendants/Counterclaimants

Charleston, South Carolina
June 28, 2012